# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CALIFORNIA VALLEY MIWOK TRIBE, *et al.*, | |
| Plaintiffs, | Case No. 22-cv-1740 (JMC) |
| v. | |
| DEB HAALAND, U.S. Secretary of the Interior, *et al.*, | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

For Indian tribes across the nation, formal organization under the Indian Reorganization Act (IRA) embodies two bedrock principles of federal Indian law: the right of a tribe to dignified treatment as a sovereign people endowed "with the power of regulating their internal and social relations" on one hand, *see Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55 (1978), and "the distinctive obligation of trust incumbent upon the Government in its dealings with these . . . sometimes exploited people" on the other, *see Seminole Nation v. United States*, 316 U.S. 286, 296 (1942).[1] A tribe becomes "organize[d]" through a process known as a Secretarial Election, which calls for the creation of "an appropriate constitution and bylaws," ratification of these founding documents by a majority vote of adult tribal members, and final approval by the Secretary of the Interior. 25 U.S.C. § 5123. Far more than mere symbolism, organization vests a tribe with

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

important sovereign rights and powers, particularly in the realm of government-to-government relations, *see id.* § 5123(e), and may open the door to substantial economic benefits too.

For the California Valley Miwok Tribe (CVMT), a federally recognized tribe in Northern California, the path towards organization under the IRA has been obstructed by years of legal battles over one foundational question: who has a legitimate claim to membership and thus the right to participate in the Tribe's organization? Plaintiffs, acting in the name of the CVMT, challenge that the Bureau of Indian Affairs (BIA) resolved that foundational question incorrectly. Specifically, they have sued various government officials over a 2022 decision issued by Assistant Secretary for Indian Affairs (AS-IA) Bryan Newland, which set out the eligibility criteria for potential tribal members entitled to participate in the Tribe's organization. According to Plaintiffs—who claim to be the exclusive members of the Tribe—the eligibility criteria is overinclusive, the Government's rationale for the criteria is lacking, and consequently the decision must be set aside as arbitrary and capricious in violation of the Administrative Procedure Act.

Having reviewed the administrative record, and in light of the deference afforded to agencies under arbitrary-and-capricious review, the Court cannot agree that the Government erred in its 2022 decision. Far from arbitrary and capricious, the Government's decision derives from reasonable efforts to ensure that the "tribal government [would] fully and fairly involve the tribal members," *see Morris v. Watt*, 640 F.2d 404, 415 (D.C. Cir. 1981), including many people who Plaintiffs themselves had long recognized as members and even leaders of the Tribe (notwithstanding their efforts to exclude those same individuals now). As such, and for the reasons set out below, the Court **DENIES** Plaintiff's motion for summary judgment, and **GRANTS** the Government's cross-motion for summary judgment.

## I.    BACKGROUND

"It is well settled that judicial review of agency action is normally confined to the full administrative record before the agency at the time the decision was made." *Env't Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981). As such, the Court draws the following background information from the administrative record and the procedural history of the present suit.

### A.  Origins of the California Valley Miwok Tribe

At the turn of the twentieth century, a governmental survey revealed that several thousands of Indians in Northern California were left with minimal resources and "without land." ECF 34-1 at 4–5. In response to this survey, Congress appropriated money, without specifying any particular tribe, "[f]or support and civilization of the Northern Indians" and to purchase land "for Indians who [were] not [then] upon reservations." Act of June 21, 1906, 34 Stat. 325, 333. With funds set aside, the Government then set out to identify the needs of these landless Indians, including those in the region that became home to the CVMT: the Sheep Ranch District. *See* ECF 34-1 at 62 (1906 Sheep Ranch survey listing seven Indians without land).

In 1915, a census by Indian Agent John Terrell (employed by the agency that would become the BIA) identified a group of twelve Indians residing "at and near Sheepranch in Calaveras Co[unty]." ECF 34-2 at 3. These "Sheepranch Indians" were described as "the remnant of once quite a large band of Indians in former years living in and near the old decaying mining town" and were "[t]o some extent . . . interchangeable in their relations" with those in nearby towns in Calaveras County. ECF 34-2 at 2–3; ECF 34-43 at 3. Some of the Indians listed, including "Peter Hodge, the leading member of this little band," did not live in Sheep Ranch proper, residing instead "about 2 ½ miles [to the] north." ECF 34-2 at 2. Based on Terrell's social, economic, and agricultural assessment of the region, he identified parcels of land the Government could purchase

for the Indians in the area "that w[ould] fairly well meet the[ir] requirements." *Id.* at 3. The following year, the Department of the Interior acquired a roughly one-acre lot in the town of Sheep Ranch, securing a "deed . . . in the name of the United States of America [that] d[id] not name any specific tribe, band, or group of Indians." ECF 34-15 at 3; ECF 34-43 at 3. This "rancheria"—a term generally used to describe both a "reservation" (i.e., the land) and a "tribe" (i.e., the Indians living there)—became the federally recognized "Sheep Ranch Rancheria of Me-Wuk Indians of California" and, eventually, the modern-day CVMT. *See* ECF 34-43 at 4 n.14, 5.[2]

The population of Miwok Indians residing in and around the Rancheria ebbed and flowed over time. By 1927, there were twenty-five Indians in "the Sheep Ranch band," with thirteen or fourteen residing on the parcel of land "purchased at Sheep Ranch." ECF 34-4 at 5. By 1929, a survey of Calaveras County identified a large number of Miwoks in the broader community, including the Davis, Dixie, Hodge, Jeff, and Shelton families, ECF 34-5 at 3–9, some of whom were also identified on Terrell's 1915 Census of those "at and near Sheepranch," *see* ECF 34-2 at 3. Yet by 1935, shortly after the enactment of the IRA, "[t]he BIA found only one eligible adult Indian, Jeff Davis, to be residing on the Rancheria." ECF 34-43 at 3, 5 n.19. On behalf of the Tribe, Jeff Davis voted to accept the IRA. ECF 34-7 at 2; *see* ECF 34-6 at 2 (purpose of IRA referendum was to "determine whether the Indians of such reservation want[ed] to exclude themselves from the application of the [IRA]").

Following the death of Jeff Davis in 1940, ECF 34-62 at 51, and with the Tribe under governmental supervision, several BIA determinations of "ownership or rights to the Sheep Ranch Rancheria" benefited the Miwoks listed on the 1929 Census and their descendants, ECF 34-8 at 2, seemingly due to their residence on the Rancheria land itself. In 1943, the BIA determined that

---

[2] Alternative spellings of "Miwok" used throughout the administrative record include: "Mi-Wuk," "Me-Wuk," and "Miwak." ECF 34-43 at 2 n.2.

Tillie Jeff, the widow of John Jeff (a 1929 Census Miwok) had moved to the Rancheria, "upon which she [was entitled to] reside as long as she desire[d]." ECF 34-62 at 48–49. In 1954, the BIA rejected a claim by Tom Hodges (a 1915 Census Miwok) to a right of residency on the Rancheria in favor of the Carsoner family (1929 Census Miwoks), noting that the latter had lived on the land since 1950, while the former had acquired residency and membership in a different, non-Miwok tribe. ECF 34-8 at 2; ECF 34-2 at 3 (1915 Census); ECF 34-5 at 2 (1929 Census); *see also* ECF 34-23 ¶ 3 (affidavit of 1929 Census descendant attesting to familial residence on Rancheria throughout 1950s). And in 1966, pursuant to a since-reversed congressional policy of terminating rancherias, the BIA identified Mabel Dixie—the granddaughter of John Jeff of the 1929 Census, ECF 34-62 at 44–45—as the sole person entitled to receive beneficial title to the land due to her years of residence there with her uncle, Lenny Jeff, and husband, Merle Butler. ECF 34-14 at 2; ECF 34-13 at 2–3; ECF 34-16 at 2; *see also* ECF 34-9 (reproducing Pub. L. 85-671, 72 Stat. 619, regarding "distribution of the land and assets of certain Indian rancherias"). During this attempted distribution, the BIA rejected a claim to entitlement by Lena Hodge Shelton (a 1915 Census Miwok), who since 1943 had "resided on a lot adjacent to the rancheria," ECF 34-62 at 51, and was deemed "ineligible to participate" in the distribution process, ECF 34-15 at 5.

As a result of the Government's efforts to terminate the Tribe—a process that was never finalized—the BIA transferred title of the Rancheria to Mabel Dixie in 1967. ECF 34-43 at 4 & n.14; ECF 34-16 at 2. Upon Mabel Dixie's death in 1971, beneficial title to the Rancheria (now held in trust by the United States) passed to her heirs, including Yakima Dixie, who went on to serve as the Tribe's "Chief and Spokesperson" from his mother's death onward. ECF 34-17 at 2; ECF 34-35 at 3; ECF 34-43 at 4; *see also, e.g.*, ECF 34-23 ¶ 4. When Yakima Dixie passed away in 2017, ECF 34-45 at 2, his interest in the Rancheria passed to "a distant relative" named Velma

Whitebear, ECF 34-70 at 2–3; ECF 34-71 at 4; ECF 34-35 at 4. Velma Whitebear, like many others, claimed CVMT membership by tracing her ancestry to John Jeff of the 1929 Census. ECF 34-29 ¶ 3; *see also* ECF 34-23 ¶ 3.

### B. Recent Efforts to Organize the Tribe

Since roughly the 1990s, the CVMT has been embroiled in disputes over tribal membership and leadership that have impeded the Tribe's ability to organize under the IRA. Given the importance of these disputes to the Government action Plaintiffs challenge as arbitrary and capricious, the Court will recount the history of the tribal, governmental, and judicial actions that gave rise to the current lawsuit.

#### 1. *Attempts to Organize by the Burley Faction & the* CVMT I–II *Litigation*

In the late 1990s, the CVMT made three consecutive unsuccessful attempts to organize under the IRA. This process began when, per the recommendation of the BIA and through a resolution signed by just two people, the Tribe formed a general council under the leadership of Yakima Dixie on November 5, 1998. *CVMT v. United States* (*CVMT I*), 424 F. Supp. 2d 197, 198 (D.D.C. 2006); ECF 34-32 at 5. But Yakima Dixie seemingly resigned from this lead role,[3] and by June 25, 1999, the BIA had recognized Silvia Burley, the other signatory to the Tribal Council's founding resolution (and a descendant of John Jeff), as tribal chairperson. *CVMT I*, 424 F. Supp. 2d at 198; ECF 34-18 at 2–3; ECF 34-19 at 40–41; ECF 34-32 at 5.

With protests from Yakima Dixie throughout, Silvia Burley first attempted to organize the Tribe in 2000, when she put forth a petition to the BIA to conduct a secretarial election, which the BIA failed to act on and Burley eventually withdrew. *CVMT I*, 424 F. Supp. 2d at 199. The second attempt took place in September 2001, when the Tribe sent the BIA an updated constitution, which

---

[3] Whether Yakima Dixie resigned voluntarily, or even resigned at all, was disputed for years. *See, e.g.*, ECF 34-41 at 7 ("Mr. Dixie consistently denied resigning as Tribal chairman from April 21, 1999 until February 2012.").

the BIA did not approve. *Id.* at 199–200. The third attempt occurred in February 2004, when the Tribe provided another copy of its draft constitution to the BIA, *see id.* at 200, which was rejected because "the only persons of Indian descent involved in the Tribe's organization efforts[] were [Silvia Burley] and [her] two daughters," and the proposed "base roll contain[ed] only the names of five living members," ECF 34-20 at 2–3. In other words, the BIA concluded that the process excluded much of "the whole tribal community." *Id.* In particular, the BIA was troubled by the failure to involve: (1) the Dixie family, Merle Butler, and the Jeff family, all of whom "[we]re known to have resided at Sheep Ranch Rancheria at various times in the past 75 years and . . . who ha[d] inherited an interest in the Rancheria"; (2) "Indians (such as Lena Shelton) and their descendants who once lived adjacent to the Sheep Ranch Rancheria"; or (3) the broader "Indian communities in and around the Sheep Ranch Rancheria . . . who ha[d] maintained . . . cultural contact with Sheep Ranch" generally, seeing as "the Indians of [the] Sheep Ranch Rancheria were in fact[] part of a larger group of Indians residing [in the area]." *Id.*

The Tribe's improper organization efforts prompted the United States to modify the Tribe's federal contract, the State of California to withhold substantial monetary distributions from its Indian Gaming Revenue Sharing Trust Fund,[4] and "the Burley faction" to file a lawsuit against the BIA for refusal to acknowledge the Tribe as organized. *CVMT I*, 424 F. Supp. 2d at 200–01. A judge in this District rejected that challenge, concluding that the BIA's decision was lawful and, indeed, entirely consistent with the agency's "duty to ensure that the interests of all tribe members are protected during organization and that governing documents reflect the will of a majority of the Tribe's members." *Id.* at 202.

---

[4] This program, managed by the California Gambling Control Commission, provides quarterly fixed payments of $275,000 to non-gaming tribes within the State. *CVMT I*, 424 F. Supp.2d at 201 n.4; *see also Indian Gaming Revenue Sharing Trust Fund*, CAL. GAMBLING CONTROL COMM'N (2024), https://www.cgcc.ca.gov/?pageID=rstfi.

The D.C. Circuit affirmed the dismissal of the Burley faction's lawsuit. *CVMT v. United States* (*CVMT II*), 515 F.3d 1262, 1268 (D.C. Cir. 2008). The circuit court, like the district court, focused on the Government's power and duty to manage Indian affairs, noting that "[t]he exercise of this authority is especially vital when, as is the case here, the government is determining whether a tribe is organized, and the receipt of significant federal benefits turns on the decision." *Id.* at 1267. As such, the Burley faction's attempt to limit tribal membership to "[Silvia] Burley and her small group of supporters" constituted an "antimajoritarian gambit [that] deserve[d] no stamp of approval from the Secretary." *Id.*

### 2. *The 2011 Echo Hawk Decision &* CVMT III *Litigation*

Not long after the D.C. Circuit ruled against the Burley faction's organizational efforts, which flew in the face of tribal "majoritarian values," *CVMT II*, 515 F.3d at 1268, the BIA issued a decision that "mark[ed] a 180-degree change of course," concluding that "prior Department officials . . . fundamentally misunderstood the[ir] role," ECF 34-32 at 3, 7. In late 2011, AS-IA Larry Echo Hawk pronounced via letter (the "Echo Hawk Decision") that "there are only five citizens of CVMT" (i.e., Yakima Dixie, Silvia Burley, and three of Burley's relatives), and the Government "does not have a legitimate role in attempting to force the Tribe to expand its citizenship." *Id.* at 2, 7–8. Echo Hawk reasoned that, as a federally recognized tribe that had formed a general council, the CVMT retained the sovereign authority to set its citizenship criteria without interference from the federal government. *Id.* at 5, 9. The former AS-IA concluded that, although it would be "*equitably* appropriate for the CVMT General Council to reach out to potential citizens of the Tribe," it would be improper "*as a matter of law*, for the Federal government to attempt to impose such a requirement on a federally recognized tribe." *Id.* at 7 n.3. In fact, according to Echo

Hawk, "[t]he Federal government is under no duty or obligation to 'potential citizens' of the CVMT" at all. *Id.* at 8.

A judge in this District rejected the Echo Hawk Decision as arbitrary and capricious roughly two years later. *CVMT v. Jewell* (*CVMT III*), 5 F. Supp. 3d 86, 88 (D.D.C. 2013). The court rejected the Government's proposition that "once a Tribe announces a government, the BIA is prohibited from ever questioning the legitimacy of th[at] government." *Id.* at 100. The court also rejected "the conclusion that the citizenship of the Tribe consists solely of [five people]" in light of a "record [that] [wa]s replete with evidence that the Tribe's membership is potentially significantly larger." *Id.* at 98. That record documented the BIA's longstanding recognition "that the Tribe consisted of a 'loosely knit community of Indians in Calaveras County'" with a potential membership "of at least 250 individuals." *Id.* That record included affidavits from several people affiliated with the Tribe—many of whom traced their tribal lineage "to Jeff Davis . . . through . . . John and Tilly Jeff," *e.g.*, ECF 34-28 ¶ 3—who attested to an active tribal community involving substantially more than five members. *See* ECF 34-22 ¶ 8 ("Attendance at the [Tribal Council] meetings ranges from approximately 30 persons to more than 100 persons."); *accord.* ECF 34-23 ¶ 8; ECF 34-25 ¶ 8; ECF 34-27 ¶ 9; ECF 34-29 ¶ 8. And that record also included sworn testimony from current Plaintiff Michael Mendibles, who expressed dismay at the Burley faction's "continued efforts to deny the benefits of Tribe membership to other members." ECF 34-27 ¶ 28.

### 3. The 2015 Washburn Decision & CVMT IV Litigation

Following remand to the BIA, those aligned with Yakima Dixie, who claimed to represent "the full Tribal community," ECF 34-37 at 2, encouraged the BIA to proceed with their tribal constitution, which was purportedly "ratified . . . by a vote of 90 to 10" in 2013 during the pendency of *CVMT III*, ECF 34-38 at 3; *see also* ECF 34-36 at 20 (noting that 100 out of 200 eligible voters

participated). According to the 2013 Constitution, the Tribe "included the Me-wuks on th[e] [1929] census as Members" since, historically, "many . . . members came and went from the Sheep Ranch Rancheria over the decades after 1915[,] and the Tribe existed as a network of related families with regional ceremonies." ECF 34-36 at 2. Those with an "inherent right" to membership under the 2013 Constitution included the "lineal descendant[s] of one of the 14 persons with whom the Federal government conducted official business with the Tribe between 1915 and 1967" as well as "[a]ny person or the lineal descendant of [those] identified as Me-wuk in the 'Indian Census Roll' for the County of Calaveras (dated June 30, 1929)." *Id.* at 4.

On December 30, 2015, AS-IA Kevin Washburn issued a letter (the "Washburn Decision") in which he rejected both the Burley *and* Dixie factions' organizational efforts, attempted to answer "questions as to the overall membership of the Tribe," and affirmed the BIA's commitment "to help the Tribe attain its manifest goal of reorganizing." ECF 34-43 at 2, 6–7. In doing so, Washburn echoed the unambiguous conclusion of the courts in *CVMT I*, *CVMT II*, and *CVMT III* that "the record shows that there are far more than five people eligible to take part in the organization of the Tribe." *Id.* at 5. He noted that, although the Government purchased land in Sheep Ranch "for the benefit of a band of Indians identified by [the 1906 Census] and [1915 Census]," the land acquired simply "was not large enough for all members of the band to take up residence." *Id.* As a result, "BIA field officials remained cognizant of the Indians of [the] band associated with, but not residing upon, [the] rancheria" by "assign[ing] [available] land to . . . non-resident Indian[s] who w[ere] associated with the band, if possible." *Id.* In this way, "potential residents equated to potential members." *Id.* This history, as understood by Washburn, reaffirmed "that the Tribe is not limited to five individuals" as the Burley faction had insisted. *Id.* at 4. And even though the Dixie faction involved substantially more people (i.e., around 100) in its

10

organizational efforts, Washburn still rejected those efforts for lack of "evidence that outreach to the greater tribal community was part of the drafting or ratification of the [2013] Constitution." *Id.* at 7 n.28.

Thus, after considering "the Department's dealings with the California Rancherias and in light of the rulings in *CVMT I*, *II*[,] and *III*," Washburn determined that the "Eligible Groups" entitled to participate in the reorganization of the Tribe included "the Mewuk Indians residing in the Sheep Ranch area . . . [,] for whom the Rancheria was acquired and their descendants," which included:

> (1) the individuals listed on the 1915 Terrell Census and their descendants; (2) the descendants of Rancheria Resident Jeff Davis (who was the only person on the 1935 IRA voters list for the Rancheria); and (3) the heirs of Mabel Dixie (the sole Indian resident of the Rancheria eligible to vote on its termination in 1967) . . . and their descendants.

*Id.* at 5. Washburn considered, but decided against, "including the descendants of the Miwok Indians identified on the 1929 Census" automatically. *Id.* at 6. Washburn instead left that as a discretionary choice for the Eligible Groups, observing that inclusion of the 1929 Census descendants "may be proper in light of Agent Terrell's conclusion [in 1915] that 'to some extent the Indians of Sheepranch [and surrounding areas] are interchangeable in their relations'" and the fact that those on the 1915 Census "had relatives in other Calaveras County communities." *Id.* Findings from the BIA at the time confirmed that there were very few 1929 Census descendants who were not already accounted for in Washburn's Eligible Groups. *See* ECF 34-44 at 4 (concluding that "a majority of those who participated in the 2013 constitutional election and all of the Burley Group descend from . . . Jeff Davis").

Despite the Government's understanding that the Burley group was included in Washburn's Eligible Groups, *see* ECF 34-43 at 6 & n.23; ECF 34-44 at 4, the Burleys still sued to

strike down the Washburn Decision as arbitrary and capricious. Once again, the Burleys asserted that "membership in the Tribe is . . . limited to five people," and, once again, a federal district court rejected their position. *See CVMT v. Zinke* (*CVMT IV*), No. 16-cv-1345, 2017 WL 2379945, at *4, *6 (E.D. Cal. June 1, 2017), *aff'd*, 745 F. App'x 46 (9th Cir. 2018).

### 4. *A Genealogical Discovery Derails Organization*

After the ruling in *CVMT IV*, the Tribe's efforts to organize seemed to be on track. Although Yakima Dixie passed away in 2017, ECF 34-45 at 2, current Plaintiff Michael Mendibles took over as "spokesperson during the petitioning and Secretarial election process," ECF 34-47 at 2. On October 26, 2018, "the California Valley Miwok Tribe (Tribe) and Michael Mendibles" (through counsel) petitioned the BIA to hold a Secretarial Election to ratify a slightly revised version of the 2013 Constitution. ECF 34-46 at 2. *Compare* ECF 34-36 (2013 Constitution), *with* ECF 34-50 (2018 Constitution). The 2018 Constitution, like the 2013 Constitution, included individuals listed on the 1929 Census and their lineal descendants as members, consistent with historic understanding of "the Tribe includ[ing] the Mewuks on that census as members." ECF 34-50 at 2, 5; *accord* ECF 34-36 at 2, 4. The petition for an election was supported by 153 out of 289 eligible voters, ECF 34-48 at 2, including 7 of the 9 individual Plaintiffs in the current action, ECF 34-47 at 16 (Plaintiffs Leon Mendibles, Christopher Russell, and Rosalie Russell); ECF 34-47 at 20 (Plaintiffs Marie Diane Aranda, Yolanda Fontanilla, and Bronson Mendibles); ECF 34-47 at 46 (Plaintiff Michael Mendibles).

The 2018 petition was validated by the BIA, *see* ECF 34-49, but the organizational process fell apart after a critical genealogical discovery in 2019: "John[] Jeff . . . is not the son of Jeff Davis." ECF 34-64 at 12. Contrary to prior understanding, it seemed that Jeff Davis "had no surviving spouse and no surviving descendants" at all. ECF 34-62 at 64. Until this point, however,

the majority of those participating in the organizational process claimed membership under the Washburn Decision by tracing their ancestry to Jeff Davis *through* John Jeff, believing him to be Jeff Davis's son. *See, e.g.*, ECF 34-55 at 4; *cf.* ECF 34-44 at 4. After stripping away this connection to Jeff Davis, descendance from John Jeff—a Miwok on the 1929 Census but not the 1915 Census—would not confer any right to membership in the CVMT.

Signs of this genealogical error did not emerge in earnest until after a Secretarial Election to adopt the 2018 Constitution was already approved and under way. *See* ECF 34-51. In early 2019, the BIA faced both letters and lawsuits raising the issue of Jeff Davis's lineage, *see* ECF 34-52 (letter to BIA from Plaintiff Leon Mendibles); *Aranda v. Sweeney*, No. 19-cv-613, 2019 WL 1599178 (E.D. Cal. Apr. 15, 2019) (lawsuit seeking to enjoin election brought by Plaintiffs Marie Diane Aranda and Yolanda Fontanilla), and the Department of the Interior's Office of Federal Acknowledgment (OFA) investigated the matter and recognized the need for correction by May 30, 2019, *see* ECF 34-64 at 2, 12. That same day, while the Tribe had already ratified the 2018 Constitution "by a vote of 143 for and 12 against," ECF 34-59 at 2, the BIA concluded it had "no choice but to invalidate the election" since "[m]ost of the people who petitioned for, and took part in, the Secretarial Election [we]re descendants of John Jeff," ECF 34-65 at 3.

The genealogical correction had enormous consequences for the Tribe's organization. For one, it meant that not one person could claim eligibility under at least one, possibly two,[5] of the three Eligible Groups Washburn set out in 2015. *See* ECF 34-62 at 64 ("[T]here are no descendants

---

[5] There is some confusion as to whether any living person satisfies the third Washburn criterion: "heirs of Mabel Dixie . . . and their descendants." ECF 34-43 at 5. An expert report from prior litigation suggested that, after Yakima Dixie's death, there were "no descendants" who met this criterion, ECF 34-62 at 64, but that may be inaccurate. Merle Butler, Mabel Dixie's husband, was an heir who acquired one-third of Mabel Dixie's estate (including a one-third interest in the CVMT land). ECF 34-17 at 2; ECF 34-43 at 4. Merle Butler appears to have at least one descendant named Dequita Boire who now holds his one-third interest. ECF 34-71 at 4. Thus, applying the Washburn Decision (even without Newland's revision) may include at least one more member as a *descendant* of an *heir* of Mabel Dixie. *See* ECF 34-43 at 5. *Contra* ECF 34-72 (BIA public notice listing third eligible group as "[d]escendants of Mab[el] Hodge Dixie").

meeting Criterion No. 2 . . . [or] Criterion No. 3 set by Kevin Washburn."). It also excluded those who held a majority of the beneficial interest in the CVMT land itself—i.e., the heirs of Velma Whitebear, a devisee of Yakima Dixie and long-time Tribal Council member who traced her tribal lineage through John Jeff. ECF 34-29 ¶ 3; ECF 34-69 at 2; ECF 34-70 at 3; ECF 34-71 at 4. And as a matter of sheer numbers, applying the Washburn Decision after this genealogical correction took a Tribe that was described repeatedly as "consist[ing] of at least 250 individuals," *CVMT III*, 5 F. Supp. 3d at 98, comprising a broad "network of related families with regional ceremonies," ECF 34-50 at 2, and cut that group down to roughly 10 people, *see* ECF 34-79 at 3.

With this correction in the record and sudden reduction of the Eligible Groups under the Washburn Decision, two new factions struggling for control of the Tribe emerged. On one hand, the handful of individuals still eligible under the Washburn Decision—i.e., the Plaintiffs in this action—insisted "that the BIA move forward with [an] Election expeditiously." ECF 34-76 at 3. On the other, those who were now excluded from the "Eligible Groups" pleaded with the BIA to "stay any organizational efforts," ECF 34-73 at 2, and "issue a new or amended decision specifically including descendants of the Mewuk people in Calaveras County who were listed on the 1929 BIA census[] as eligible to participate in the formal reorganization of the [CVMT]," ECF 34-67 at 2; *see also* ECF 34-74 at 2 (letter to Senator Diane Feinstein stating that the Washburn Decision "eliminat[es] hundreds of . . . worthy indigenous Miwok people [and] eras[es] them from the legacy and history of indigenous Tribes that existed in this country long before it became America"). By mid-2022, the latter group prevailed.

### 5.  *The 2022 Newland Decision*

On May 31, 2022, AS-IA Bryan Newland revised the 2015 Washburn Decision via memorandum (the "Newland Decision"). Newland observed that Washburn sought "to help the

14

Tribe attain its manifest goal of reorganizing" and ensure that "the greater Tribal community" was included in that process, consistent with the BIA's and the courts' repeated conclusion that "there are far more than five people eligible to take part." ECF 34-78 at 2–3, 5. "Yet," Newland continued, "excluding John Jeff's descendants severely reduces who can take part in the organizational process" in a manner contrary to Washburn's goals and findings. *Id.* at 5.

Newland concluded that Washburn and the Department of the Interior, "[u]ntil OFA's 2019 review of the record," had "proceeded under the factually inaccurate assumption that John Jeff was the son of Jeff Davis," which informed Washburn's delineation of the Eligible Groups. *Id.* Newland found that "the record is [and was] replete with evidence that John Jeff was a descendant of Jeff Davis," that in 2015 "[t]he evidence . . . indicated that John Jeff's descendants comprise[d] nearly the entirety of the greater tribal community," and that those descendants "had participated in Tribal affairs for decades." *Id.* at 4–5. However, after the genealogical record was clarified, this large group of people who believed themselves to be (and were long accepted as) tribal members now "were only eligible to participate with the permission of the [substantially reduced] Eligible Groups," seeing as "John Jeff [only] appeared on the 1929 Census." *Id.* at 5.

Based on the foregoing findings, Newland "revis[ed] the Washburn Decision to include the descendants of [Miwok] individuals on the 1929 Census as an eligible group." *Id.* at 6. According to Newland, this revision accounted for the "factual inaccuracy [that] manifested in th[e] process," was consistent with "the Eligible Groups' previous efforts to organize," and achieved the goal of "includ[ing] those individuals that AS-IA Washburn understood to be eligible voters in the Tribe's Organizational Process" at the time he made his decision. *Id.* at 5–6. With this one modification, Newland otherwise "incorporate[d]," "endorse[d,] and reaffirm[ed] the Washburn Decision in its entirety." *Id.* at 3, 6.

### C.  The Present Challenge

Less than three weeks after Newland issued his decision, Plaintiffs filed suit in this Court against Defendants Secretary of the Interior Deb Haaland, AS-IA Bryan Newland, and two other BIA officials. ECF 1. They bring this action on behalf of the CVMT and several individuals. Because not every case that lists "CVMT" as a party has involved the same group of people, the Court will specify that the individual Plaintiffs in this case are: Marie Diane Aranda, Joshua Fontanilla, Yolanda Fontanilla, Michael Mendibles, Bronson Mendibles, Jasmine Mendibles, Leon Mendibles, Christopher Russell, and Rosalie Russell.[6] With the exception of one other adult and one minor, these nine constitute the exclusive set of people eligible to participate in the organization of the Tribe under the original Washburn Decision. *See, e.g.*, ECF 34-79 at 2; ECF 37-2 at 6. Plaintiffs challenge Newland's modification of that decision, asking this Court to vacate his expansion of the Eligible Groups and compel the Government to conduct a Secretarial Election under the unrevised Washburn Decision. ECF 1 ¶¶ 76–88.

Plaintiffs assert two claims under the Administrative Procedure Act (APA): (1) "[t]he Newland Decision is arbitrary and capricious," and (2) the Government has "unreasonably delayed" agency action by "failing to adjudicate the status of [those] who submitted genealogies and other documentation to the BIA in response to the BIA's December 1, 2021 public notice." *Id.* ¶¶ 80, 85. However, because Plaintiffs' subsequent briefs present no argument addressing how, why, or what agency action was unlawfully delayed or withheld, *see generally* ECF 28; ECF 31, the Court understands them to have abandoned their second cause of action. That leaves only the issue of whether the Newland Decision is arbitrary and capricious and must be set aside. Having

---

[6] The Court will also expressly acknowledge that there is an ongoing case before another judge in this District that is also titled *CVMT v. Haaland*, but which involves an entirely different set of claims and individual plaintiffs. *See generally* No. 24-cv-947 (TSC), ECF 1 (Apr. 2, 2024) (lawsuit brought by Silvia Burley, among others, seeking to enjoin the use of Certificates of Degree of Indian Blood as unconstitutional).

reviewed the Parties' cross motions for summary judgment, ECF 28; ECF 30, and the extensive

administrative record in this case, *see* ECF 25, the Court is now prepared to resolve that issue.

## II.    LEGAL STANDARD

The APA directs that a reviewing court must "hold unlawful and set aside agency action,

findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law." 5 U.S.C. § 706(2)(A). When agency action is challenged as arbitrary

and capricious, the party bringing the challenge "bears the burden of proof," *Pierce v. SEC*,

786 F.3d 1027, 1035 (D.C. Cir. 2015), and summary judgment "serves as the mechanism for

deciding, as a matter of law, whether the agency action is supported by the administrative record

and otherwise consistent with the APA standard of review," *Sierra Club v. Mainella*, 459 F. Supp.

2d 76, 90 (D.D.C. 2006).

The arbitrary-and-capricious standard of review is both narrow and deferential. *Motor*

*Vehicles Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983). The Court must

review the decision and the record closely to determine "whether there has been a clear error of

judgment," but must be cautious "not to substitute its judgment for that of the agency." *Id.* The

Court's role is to "simply ensure[] that the agency has acted within a zone of reasonableness" by

considering the relevant issues and explaining its decision in a sensible manner. *FCC v.*

*Prometheus Radio Project*, 592 U.S. 414, 4f23 (2021). Thus, while the agency is charged with

articulating "a rational connection between the facts found and the choice made," *State Farm*,

463 U.S. at 43, an agency explanation of "less than ideal clarity" does not call for invalidating the

decision as a whole if "the agency's path may reasonably be discerned," *Ala. Dep't of Env't*

*Conservation v. EPA*, 540 U.S. 461, 497 (2004). Nor is an agency decision "subject[] to a more

searching review" when it marks a change in policy or position so long as the agency acknowledges that change. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–15 (2009).

Additionally, "[i]t is well settled that judicial review of agency action is normally confined to the full administrative record before the agency at the time the decision was made." *Env't Def. Fund*, 657 F.2d at 284. "[A] reviewing court should have before it neither more nor less information than did the agency when it made its decision," *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014), so the record must include—and the Court may consider—"any document that might have influenced the agency's decision and not merely those documents the agency expressly relied on in reaching its final determination," *Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, 345 F. Supp. 3d 1, 6 (D.D.C. 2018). With an (often extensive) record before it, "the district judge sits as an appellate tribunal" in these actions since "[t]he 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).

## III.   ANALYSIS

Plaintiffs argue that the Newland Decision's eligibility criteria are overinclusive and unjustifiable and thus the Government should return to its prior decision, under which the nine individual Plaintiffs would constitute virtually all of those eligible to participate in the Tribe's organization. In particular, they challenge two aspects of the Newland Decision as arbitrary and capricious. First, they argue that Newland was wrong to conclude that Washburn assumed or relied on the belief that John Jeff descended from Jeff Davis when he issued his decision in 2015, contending that "the Administrative Record contains nothing that indicates Washburn intended or understood that John Jeff's descendants be part of the Eligible Groups." ECF 28 at 18. Second, they argue that even if Washburn did proceed on that incorrect assumption, "there is no rational connection between" that finding, the "foundational premise of the Washburn De[cision]," and

Newland's "choice to include descendants of the 1929 Census in the Eligible Groups." *Id.* at 24–25. The Court is not persuaded by either argument.

### A. Newland Reasonably Concluded that Washburn Assumed the John Jeff Error

Ample evidence in the record supports Newland's conclusion that Washburn, like many others, understood John Jeff to be the son of Jeff Davis and that this understanding informed his delineation of the Eligible Groups for organization purposes.

For starters, there is direct evidence supporting Newland's conclusion that, at the time of the Washburn Decision, the common "understanding [was] that John Jeff was a descendant of Jeff Davis." ECF 34-78 at 5. A collection of statements in the record indicate that this belief was shared by the Government, by the successful plaintiffs in the *CVMT III* litigation, and by at least one Plaintiff in the current lawsuit. *See, e.g.*, ECF 34-27 ¶ 7 (affidavit of Plaintiff Michael Mendibles recognizing tribal authority of John Jeff descendants). Starting back in 1995, the BIA conducted research that "led to the preliminary conclusion that John Jeff was the son of . . . Jeff Davis." ECF 34-65 at 2; *see* ECF 34-18 at 2–4 (BIA letter indicating "John Jeff" was the son of "Jefferson Davis"). Then, during the *CVMT I* litigation nearly a decade later, Silvia Burley sat for a deposition in which she traced her tribal lineage to Jeff Davis through John Jeff and represented that the Dixie family shared those common ancestors. ECF 34-19 at 40–41; *see also id.* ("Mabel [Dixie] is family. . . . Mabel's mother is my grandfather's sister."). Then, over the course of the *CVMT III* litigation from 2011–2013, the multitude of purported tribal members who opposed the Tribe-limiting Echo Hawk Decision submitted affidavits that, once again, traced their tribal lineage back "to Jeff Davis . . . through . . . John and Tilly Jeff." ECF 34-26 ¶ 3; ECF 34-28 ¶ 3; *see also* ECF 34-23 ¶ 3 (Tribal Council member tracing tribal lineage to "John Jeff and Tillie Jeff"); ECF 34-25 ¶ 3 (same); ECF 34-29 ¶ 3 (same). Even if the record were to end there, these fairly

unequivocal statements over multiple decades provide a solid basis for Newland's finding that Washburn, like many others, assumed that John Jeff was the son of Jeff Davis.

Moreover, considering the circumstances in which the Washburn Decision was issued, it is not difficult to "reasonably . . . discern[]," *Ala. Dep't of Env't Conservation*, 540 U.S. at 497, how Newland could have concluded both that Washburn (1) "sought to include . . . the greater Tribal community" and (2) "assumed that the descendants of John Jeff comprise a portion of th[at] greater Tribal community," ECF 34-78 at 3, 5. The Washburn Decision was a direct response to a federal court's rebuke of the Echo Hawk Decision, which had unreasonably concluded that the Tribe had only five people. *See* ECF 34-43 at 2. The *CVMT III* court, just like the *CVMT I* and *CVMT II* courts before it, "emphasized that the Tribe had more than five people," and Washburn agreed that "the record showed that there are *far more.*" *Id.* at 4–5 (emphasis added). Filings by the plaintiffs in that case, both in court and to the BIA, attested to a Tribe of 200-plus adult members with a large, active tribal community. *See* ECF 34-33 at 3–4 (*CVMT III* complaint attesting to 242 adult members); *see also* ECF 34-31 at 2 (response to BIA request for briefing citing similar figure); ECF 34-27 ¶¶ 8–10 (affidavit of Plaintiff Michael Mendibles describing Tribal Council meetings attended by "more than 100 persons" and various tribal "programs aimed at benefitting the full Tribal membership").

Washburn's rejection of the Dixie Faction's 2013 constitutional efforts serves as additional evidence of his belief in a Tribe that was orders of magnitude larger than what Plaintiffs insist he would have accepted. That is, even after the Dixie Faction had represented to Washburn that its 2013 ratification process involved 100 voting members, the former AS-IA *still* rejected those efforts for insufficient evidence of "outreach to the greater tribal community . . . [regarding] the drafting or ratification of the Constitution." ECF 34-43 at 7 & n.28; ECF 34-37 at 2. In this context,

it was reasonable for Newland to conclude that, when Washburn emphasized the need to involve "the Tribe as a whole" in the organization process, ECF 34-43 at 6, the former AS-IA had a pretty large group of people in mind, *see* ECF 34-78 at 5.

Yet the only way (or at least the most likely way) Washburn's Eligible Groups could have covered anything close to the size of the "greater tribal community" Washburn pictured, ECF 34-43 at 7 n.28, is if the descendants of John Jeff were included, which is wholly consistent with the evidence indicating that Washburn assumed John Jeff descended from Jeff Davis. As the record demonstrates, and as Newland observed, "excluding John Jeff's descendants severely reduces who can take part in the organizational process," ECF 34-78 at 5; *see* ECF 34-79 at 2 (out of 165 requests, only 10 eligible members), which is in tension with Washburn's intent to "help the Tribe attain its manifest goal of reorganizing" through a process that would be "open to the whole tribal community," ECF 34-43 at 6–7. But that tension disappears if, as per the years of evidence, Government findings, and sworn testimony from individuals who served as leaders of the Tribe, John Jeff was believed to have descended from Jeff Davis. *See, e.g.*, ECF 34-43 at 6 & n.23 (Washburn noting that the Burley family "must be . . . in the Eligible Groups" so long as "documentary evidence supports [her deposition] testimony" about her tribal lineage); ECF 34-44 at 4 ("[A] majority of those [183 eligible members] who participated in the 2013 constitutional election and all of the Burley Group descend from . . . Jeff Davis").

The Court is further persuaded by the evidence in the record that the John Jeff–Jeff Davis mistake went unnoticed and unchallenged for so many years, even by the people closest to the Tribe, which includes Plaintiffs. By all indications, the Government, various individuals who had acted as members if not leaders of the Tribe, and the majority of Plaintiffs here, for several years operated under the assumption that the Eligible Groups should and did include hundreds of people,

a great deal of whom were descendants of John Jeff. *See, e.g.*, ECF 34-44 at 4 (noting that there were "183 individuals who qualify as members of the Eligible Groups" in the 2013 election); ECF 34-46 at 2–3 (listing "289 Eligible Voters" in the effort to ratify the 2018 Constitution). It was not until 2019 that doubts emerged about the John Jeff–Jeff Davis connection, and even then, it took letters, a failed lawsuit, and an investigation by the OFA for this error to be formally recognized by the Government or even by all the Plaintiffs in the current action. *See generally* ECF 34-52; ECF 34-53; ECF 34-55; *Aranda*, 2019 WL 1599178; ECF 34-65. Contrary to Plaintiffs' objections, this evidence is not "irrelevant" to Newland's conclusion about Washburn merely because it was created after 2015. *Contra* ECF 31 at 14. The fact that undisputed tribal members and leaders (i.e., Plaintiffs), purported experts, and fellow Government officials all assumed this mistake for years bolsters Newland's conclusion that Washburn, years before the error was uncovered, had made the same mistake.

Plaintiffs' assertion that "there is no evidence whatsoever that Mr. Washburn proceeded under th[e] [John Jeff] mistake" falls flat. *Contra* ECF 31 at 9. Some of Plaintiffs' arguments rely on unpersuasive nitpicking of the record. For example, Plaintiffs point out that "[t]here is evidence that would have logically suggested to Washburn that John Jeff did *not* descend from Jeff Davis," referring to birthdates listed on the 1929 Census that indicate that Jeff Davis would not have been old enough to father a child when John Jeff was born. ECF 28 at 22 & n.7. Fair enough, but the existence of some contrary evidence in the record prior to the OFA's finding in 2019 does not negate the heaps of evidence that could have led Washburn to make the John Jeff–Jeff Davis mistake just like Plaintiffs, the Government, and many others did *until* 2019.[7] Moreover, on a

---

[7] In fact, Plaintiffs' emphasis on age comparison does not help their case much. In 2019, the OFA concluded that there were a range of documented birthdates for John Jeff and Jeff Davis, and the record was deemed "too inconsistent to determine whether it was biologically possible for Jeff Davis to be the father of John/Johnny Jeff." ECF 34-64 at 11. In other words, based on age alone, it might not be *unreasonable* to reach either conclusion.

sparse, inconsistent, and at times confusing administrative record like this one, it is easy to see how people may reasonably disagree about some of the familial relations of a historically neglected group of people who: lived "at or around" a one-acre reservation in the early 1900s, spoke with Government surveyors once every few years or so, and were known by anywhere from one to five different names. *See, e.g.*, ECF 34-64 at 8, 10 (noting that John Jeff's "mother was Livianna/Liviana/Susner/Susie Jeff" and "was also called Lavianna"); ECF 34-62 at 34 (describing one "Patterson/Pattison/Potter Hodge/Hodges").

Plaintiffs' remaining arguments largely consist of mischaracterizations of the standard of review or attempts to exclude or minimize various documents in the administrative record. For example, Plaintiffs argue that the filings in the *CVMT III* litigation are irrelevant because "what *private litigants* believed in 2011 has nothing to do with what *Mr. Washburn* believed in 2015." ECF 31 at 13. This argument is difficult to square with the fact that the *CVMT III* litigation was the impetus for the Washburn Decision and, unsurprisingly, was repeatedly referenced, described, and cited therein. *See generally* ECF 34-43. On a similar tack, Plaintiffs draw a strange line between "evidence that was somehow *available* to Mr. Washburn" as opposed to "evidence Mr. Washburn *relied* upon," seemingly suggesting that the Newland Decision cannot be grounded in the former. ECF 31 at 10. But even if the Court were to turn away from its analysis of the Newland Decision and instead inquire as to whether *Washburn* considered all the evidence before him in 2015 (which is not the relevant question for this lawsuit), the fact that Washburn did not expressly cite or reproduce every document that supports Newland's conclusion does not exclude those documents from this Court's consideration, *see Fort Sill Apache Tribe*, 345 F. Supp. 3d at 6, nor render Newland's conclusion "unsupported and illogical," *contra* ECF 28 at 18.

At bottom, the Court sees no "clear error of judgment" in Newland's conclusion that, in addition to assuming that John Jeff descended from Jeff Davis, "Washburn [also] assumed that the descendants of John Jeff comprise[d] a portion of the greater Tribal community" and the Eligible Groups he delineated. ECF 43-78 at 5; *see State Farm*, 463 U.S. at 43.

**B.  Newland's Revision to the Eligible Groups Was Reasonable**

When a "factual inaccuracy . . . manifest[s]" after an agency decision was made, ECF 34-78 at 5, the agency is "assumed to possess at least some inherent authority to revisit [its] prior decision[]," *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014). And when failure to account for that factual inaccuracy would produce immense unintended outcomes, the agency may even have a "distinctive *obligation*" to revisit a prior decision for the sake of those impacted. *Cf. Seminole Nation*, 316 U.S. at 296 (emphasis added). Newland's choice to revise the Washburn Decision as he did is both consistent with these principles and reasonably supported by the record.

Removing John Jeff from the tribal family tree injected a glaring inconsistency into the Washburn Decision. After correcting for the genealogical error, to implement the original Eligible Groups without revision requires accepting that when Washburn affirmed that the Tribe was "far more than five people," based on a record "replete with evidence" of a "significantly larger" group, what he really meant was: roughly *ten* people. ECF 34-43 at 4–5; *see* ECF 34-79; *see also, e.g.*, *CVMT III*, 5 F. Supp. 3d at 98 (noting evidence that "potential membership of the Tribe consisted of 250 individuals"). It also requires accepting that Washburn would be unphased by the fact that at least one of the three eligibility criteria he defined in order to include "the whole tribal community," ECF 34-43 at 6, would cover exactly *zero* people, *see* ECF 34-62 at 64. But Newland did not accept those strange conclusions. Instead, he reasonably concluded that disqualifying so

many potential members "based on newly corrected genealogical information was contrary to the plain intent of the Washburn Decision." ECF 34-78 at 5.

In these circumstances, the BIA arguably had an obligation to reconsider the Eligible Groups. By 2022, the Tribe had endured several efforts by "rogue leaders" to thwart "the will of tribal members," *CVMT II*, 515 F.3d at 1267, but time and again those efforts were rejected, often with judicial admonishments to the BIA to fulfill its "distinctive obligation of trust" owed to the Tribe, *see CVMT III*, 5 F. Supp. 3d at 100 (quoting *Seminole Nation*, 316 U.S. at 296). After all, the stakes of the Newland Decision are far more than abstract or academic. As of March 31, 2024, the California Gambling Control Commission's "[d]isbursements held on behalf of the California Valley Miwok Tribe" from its Gaming Revenue Sharing Trust Fund surpassed $21,000,000—an amount that "does not change based on the number of tribe members." *CVMT I*, 424 F. Supp. 2d at 203 n.7; *see* Susie Ngo, *Revenue Sharing Trust Fund Distribution (RSTF) Report of Distribution of Funds to Eligible Recipient Indian Tribes for the Quarter Ended March 31, 2024*, CAL. GAMBLING CONTROL COMM'N 12 (Apr. 18, 2024), https://www.cgcc.ca.gov/documents/rstfi/2024/13_RSTF_Distrib_89th_CommStaffReport-3-31-24.pdf. In other words, the determination of who may participate in the CVMT's organization is critical not just for the "tribe's political integrity," *CVMT II*, 515 F.3d at 1267, but also for the equitable distribution of economic benefits that are, by any standard, monumental. For a plethora of reasons then, it was incumbent upon Newland to ensure that the organizational process "reflect[ed] the will of a majority of the tribal community." *CVMT I*, 424 F. Supp. 2d at 202.

So, when Newland considered how to ensure, consistent with the Washburn Decision, that the organization "process [was] open to the whole tribal community," ECF 34-43 at 6, he reasonably "based [his decision]" at least in part "on the Eligible Groups' previous efforts to

organize," ECF 34-78 at 6. That includes the 2013 Constitution, supported "by a vote of 90 to 10," ECF 34-37 at 2, which stated that "Members of the tribal community were identified in the 1929 Federal Indian Census Roll for Calaveras County" and that "the Tribe included the Me-wuks on that census as Members," ECF 34-36 at 2. That also includes the 2018 Constitution, supported "by a vote of 143 [to] 12," ECF 34-59 at 2, which recounted the same history and conferred membership upon the same 1929 Census descendants, ECF 34-50 at 2–5.

Notably, the record shows that these previous efforts and shared understanding surrounding the 1929 Census descendants were supported, if not spearheaded, by many of the Plaintiffs now suing to exclude those same people. *See, e.g.*, ECF 34-47 at 2 (designating Plaintiff "Michael Mendibles to act as . . . spokesperson" in support of 2018 Constitution). Year after year, through litigation and otherwise, the Tribal Council (which included Plaintiff Michael Mendibles) vehemently opposed attempts to limit the Tribe to a handful of people, defended the notion of a tribal community that included the 1929 Census descendants, and worried that Silvia Burley would push out other members just so she could "gain access to [the] more than $6 million" in funds from the State of California that had already accrued. *See, e.g.*, ECF 34-27 ¶¶ 3, 7, 26. Now, with the shoe on the other foot and an increased pot of $21 million, Plaintiffs outright deny having ever considered the 1929 Census descendants as members. *See, e.g.*, ECF 37-2 at 2 (Plaintiff Michael Mendibles stating, "[m]y family and I have always understood that the Tribe consists of descendants of Miwok Indians who were identified on a 1915 Census."). But Newland made his decision based on an extensive record that told quite a different story, which leaves the Court struggling to understand how it was "irrational" for Newland to define the Eligible Groups in a manner consistent with Plaintiffs' long-held views of tribal membership. *Contra* ECF 31 at 9.

It also bears emphasizing that Washburn himself believed that "including the descendants of the Miwok Indians identified on the 1929 Census as eligible to take part in the organization of the Tribe *may be proper*." ECF 34-43 at 6 (emphasis added); ECF 34-78 at 3 (Newland quoting the same). To be sure, the former AS-IA did not guarantee the participation of the 1929 Census descendants, instead leaving it to the discretion of the Eligible Groups. ECF 34-43 at 6. But Plaintiffs overplay their hand, arguing that "[t]here is no way to logically argue . . . that mimicking criterion for membership that Mr. Washburn specifically rejected effectuates [his] intent." ECF 31 at 19. Again, Washburn did not "reject[]" this group outright, *contra id.*, but expressly left the door open for its inclusion "in light of" historic understanding of tribal relations dating back to Terrell's survey in 1915, *see* ECF 34-43 at 6. As such, if Washburn's goal was to guarantee "a process open to the whole tribal community," *id.*, it is far from illogical to conclude that Washburn might have included the 1929 Census members if he had known that a substantial majority of that "tribal community"—i.e., the many descendants of John Jeff—would not be included in his Eligible Groups at all, *see* ECF 34-64 at 2 (OFA noting that John Jeff lineage question "w[ould] affect 178 to 183 individuals"); ECF 34-44 at 4 (analysis of 2013 election, before OFA's John Jeff–Jeff Davis correction, finding only 17 individuals from 1929 Census not in Eligible Groups); ECF 34-78 at 5 (Newland noting that John Jeff correction "severely reduces who can take part in the organizational process" despite "[Washburn's] understanding that these individuals would be included").

Still other express principles and findings in the Washburn Decision, which Newland "incorporate[d]" and "reaffirm[ed]," support Newland's choice to include the 1929 Census descendants in the Eligible Groups in order "to effectuate Mr. Washburn's intent." ECF 34-78 at 3, 6. Plaintiffs argue that the only reasonable reading of the Washburn Decision or historical record is that Washburn intended membership to extend to 1915 Census descendants alone, but this is

belied by the Washburn Decision itself. *Contra* ECF 31 at 20–21. If all that mattered to Washburn was descendance from the 1915 Census, why bother including two additional categories of Eligible Groups? *See* ECF 34-43 at 5. Why bother naming Mabel Dixie as a tribal ancestor, seemingly just because she was "the sole Indian resident on the Rancheria" in 1967? *See id.* Why bother recapping the historic importance of "associated band Indians" being treated as "potential members" because "membership . . . was tied to residence," especially in a section explaining why "the Tribe is not limited to five individuals?" *See id.* at 4–5. And why bother noting that inclusion of 1929 Census descendants "*may be proper*" at all? *See id.* at 6 (emphasis added). Plaintiffs' central argument is that the single most important principle from the Washburn Decision "is that those eligible . . . descend from Indians designated 'Sheepranch Indians' in the 1915 [C]ensus." ECF 28 at 26. But Plaintiffs fail to contend with the superfluity and contradictions their position creates, making it difficult for this Court to hold that Newland is the one whose conclusions are "without justification." *See id.* at 18.

The notion that the Tribe is limited to 1915 Census descendants alone also fails to find a foothold in the historical record strong enough to establish that Newland's decision was "irrational[]." *Contra id.* at 24. Indeed, the quantity of evidence that cuts against Plaintiffs is somewhat overwhelming. Neither the statute authorizing the Government to purchase the CVMT land, nor the deed acquired by the United States, "name[d] any specific tribe, band, or group of Indians." ECF 34-15 at 3; *see* Act of June 21, 1906, 34 Stat. 325, 333. Agent Terrell observed in 1915 that the Indians of Sheep Ranch and its surrounding areas were "interchangeable in their relations." ECF 34-2 at 3. From the 1940s through the 1960s, the BIA repeatedly conferred rights to residency and political participation upon 1929 Census descendants, sometimes to the exclusion of 1915 Census descendants who did not reside on the land itself. *See, e.g.*, ECF 34-62 at 48–49;

ECF 34-8 at 2; ECF 34-15 at 5. When the BIA rejected Silvia Burley's organization efforts in 2004, it did so because she failed to involve several individuals "who [we]re known to have resided at Sheep Ranch Rancheria at various times in the past 75 years and persons who ha[d] inherited an interest in the Rancheria." ECF 34-20 at 3. For over 40 years and until his death in 2017, Yakima Dixie, a descendant of John Jeff (and thus the 1929 Census), served as the Tribe's "Chief and hereditary Spokesperson" and was recognized as such. ECF 34-35 at 4; ECF 34-27 ¶ 5. Both before and after the Washburn Decision, Plaintiffs and many others described the Tribe as a broad community that included the Miwoks "identified in the 1929 Federal Indian Census Roll for Calaveras County." ECF 34-36 at 2; ECF 34-50 at 2. And today, beneficial title in the tribal land itself is held by persons who trace their lineage to the 1929 Census. *See, e.g.*, ECF 34-70 at 3.

Faced with the evidence listed above, which derives from the administrative record generally, if not express findings of the Washburn Decision in particular, Newland decided to "revise only [one] portion of the Washburn Decision" such that "the descendants of the Miwok Indians on the 1929 Census shall be included among the Eligible Groups." ECF 34-78 at 6. Whether categorized as a policy shift or mere error correction, this decision was not arbitrary and capricious. The BIA acknowledged the change it was making, provided sensible reasons for doing so, and there is nothing in the record or the Newland Decision reflecting a "fail[ure] to consider an important aspect of the problem" nor "an explanation . . . that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

## IV.   CONCLUSION

Though the Newland Decision came on the heels of an unprecedented genealogical discovery, this is far from the first time the CVMT has battled over questions of tribal membership. Across many years and several administrations, the BIA, federal courts in the Ninth and D.C.

Circuits, and many people connected to the Tribe deemed it wholly unreasonable to conclude that tribal membership was limited to just "five individuals" given a record "replete with evidence" that the figure was "significantly larger." *E.g.*, *CVMT III*, 5 F. Supp. 3d at 98. Against that backdrop, Plaintiffs in this case had to prove that the BIA, in its attempt to prevent a factual error from reducing the Tribe to only *ten* individuals, acted outside "the bounds of reasoned decisionmaking." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983). They have failed to carry that burden. If anything, the BIA's lawful commitment to "ensuring that the will of tribal members is not thwarted by rogue leaders" shines through in the Newland Decision and the administrative record supporting it. *See CVMT II*, 515 F.3d at 1267.

At the very least, the Newland Decision is reasonable. Because that is a sufficient basis to uphold it under the deferential arbitrary-and-capricious standard of review, and for the foregoing reasons throughout this memorandum opinion, Plaintiffs' motion for summary judgment, ECF 28, is **DENIED**, and the Government's cross motion for summary judgment, ECF 30, is **GRANTED**.

A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: August 12, 2024